Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RODRIGUEZ, et al.,

    *Plaintiffs*,

v.

CITY OF PATERSON, et al.,

    *Defendants*.

Civil Action No. 14-3450 (JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This case arises from the circumstances surrounding the response of two Paterson Police Department officers to a domestic dispute. Plaintiffs Carlos Rodriguez and Darline Espinal ("Plaintiffs") allege that Defendant police officers Victor Ungarian and David Baird ("Defendants") engaged in excessive force and other constitutional violations against Plaintiffs when responding to a domestic dispute at Plaintiffs' apartment. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. D.E. 67, 68. The Court reviewed all submissions,[1] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motions for summary judgment are **GRANTED** in part and **DENIED** in part.

---

[1] In this Opinion, Plaintiffs' Complaint (D.E. 1) will be referred to as "Compl." Defendants' brief will be referred to as "Baird Br." (D.E. 67). Ungarian did not file a brief (D.E. 67), and instead joined Baird's motion. Plaintiffs' brief in opposition (D.E. 71) will be referred to as "Opp. Br." Defendants filed no briefs in reply.

## I. BACKGROUND[2]

On June 9, 2012, Defendants responded to Plaintiffs' apartment on a domestic violence call. D.E. 67-3 Defendant Baird's Statement of Material Facts ("Baird SOMF") at ¶ 1. Plaintiffs had been having a verbal argument that started outside of their third-floor apartment and then continued inside. *Id.* at ¶ 2. Because the noise was so loud, a second-floor neighbor, Moises Perales, asked Plaintiff Espinal if she was okay. *Id.* at ¶ 4. Soon after, Perales called the police due to Plaintiffs' argument. *Id.* at ¶ 6. Defendants Baird and Ungarian were dispatched to Plaintiffs' apartment. At this point, the parties' versions differ significantly.

Defendants' Account

Defendants claim that once they arrived at the premises, Perales told them that Plaintiffs had been arguing for a long time and had been slamming and throwing things in the residence. *Id.* at ¶ 7. Defendants knocked on Plaintiffs' door, *id.* at ¶ 8, and when the door was slightly open, Defendants observed Rodriguez pull Espinal by her neck, *id.* at ¶ 10. Defendants then entered the apartment. *Id.* at ¶ 11. Rodriguez, in an aggressive and rude manner, advised the officers that nothing was going on and that they could leave. *Id.* at ¶ 12. Rodriguez then swung at Ungarian. *Id.* at ¶ 13. Ungarian struggled with Rodriguez to effectuate his arrest. *Id.* at ¶ 14. Baird witnessed Rodriguez assault Ungarian, *id.* at ¶ 16, but was unable to render assistance because he had been assaulted by Espinal and was attempting to arrest her, *id.* at ¶ 15-17. Espinal struggled with Baird and bit Baird during her arrest. *Id.* at ¶¶ 19-20.

Baird was treated at the St. Joseph's Medical Center emergency room for the bite, and received a tetanus shot. *Id.* at ¶ 22. Based on the bite, Espinal voluntarily consented to having her

---

[2] The Court cites to Defendant Baird's Statement of Material Facts, D.E. 67-3, to the extent that the facts are not in dispute.

blood drawn and tested for antibodies to the HIV virus. *Id.* at ¶ 23. Espinal was interviewed at the emergency room by another officer, and Espinal stated that she jumped on Defendants in an attempt to protect Rodriguez. *Id.* at ¶ 24. The interviewing officer indicated that Espinal strongly smelled of alcohol. *Id.* at ¶ 25.

As a result of the incident, Plaintiffs were charged with two counts of aggravated assault on a police officer and resisting arrest, and Rodriguez was additionally charged with aggravated assault "under domestic." *Id.* at ¶ 26. Both Plaintiffs were granted admission into a pretrial intervention program. *Id.* at ¶ 27.

Defendants Baird and Ungarian both produced use of force reports. Baird reported that he used a "[c]ompliance hold," "[h]ands and/or fists," and "[k]icks and/or feet" against both Plaintiffs. D.E. 71, Ex. 6 ("Baird Force Report"). Ungarian reported that he used "[h]ands and/or fists" and "[k]icks and/or feet" against Rodriguez, and used a "[c]ompliance hold" and "[h]ands and/or fists" against Espinal. D.E. 71, Ex. 5 ("Ungarian Force Report"). Both officers reported that Plaintiffs "[r]esisted Police Officer control" and "[p]hysically attacked or threated Police Officer." *Id.*

Plaintiffs' Account

Plaintiffs have a very different version. While Plaintiffs admit that they were arguing loudly, Plaintiffs deny that they were throwing things. Plaintiff's Response to Defendant Baird's Statement of Material Facts ("Pl. Resp.") at ¶ 7. Plaintiffs claim that Rodriguez never touched Espinal after opening the door for the Defendants. *Id.* at ¶ 10. Instead, when Rodriguez opened the door, Espinal was exiting her bedroom and saw Ungarian punch Rodriguez, causing him to fall to the ground. *Id.* Rodriguez lost consciousness temporarily. *Id.* at ¶ 11. Espinal screamed and asked why Ungarian struck Rodriguez, and then Ungarian turned and struck Espinal. *Id.* Espinal fell to the ground, and Baird then repeatedly kicked her in the head and back. *Id.* Plaintiffs contend

3

that Baird and Ungarian both participated in the arrest of Rodriguez. *Id.* at ¶ 15. Plaintiffs also contend that Espinal did not struggle with Baird during her arrest and claim that Espinal never bit Baird. *Id.* at ¶¶ 18-19, 23. Rather, Plaintiffs claim that Baird struck and kicked Espinal. *Id.* at ¶ 19. In fact, Plaintiffs claim that Paterson Police Department Internal Affairs interviewed two witnesses "that observed Officer Ungarian beat Rodriguez while he was handcuffed and on the floor." *Id.* at ¶ 27.

Plaintiffs claim that Rodriguez lost consciousness three times: (1) when Ungarian first punched him, (2) when Ungarian kicked Rodriguez in the face, and (3) when Ungarian broke a chair over Rodriguez' back. *Id.* at ¶ 14. After his arrest, Rodriguez was diagnosed with a concussion and had missing teeth. *Id.* Plaintiffs claim that Espinal signed the blood test consent form without understanding what the document meant. *Id.* at ¶ 23. Espinal claims that she was not drunk as she had only one drink more than eight hours before the incident. *Id.* at ¶ 25.

Lastly, Plaintiffs note that they were "admitted to Pretrial Intervention because [] they had no prior convictions, [there was] no apparent opposition by the Defendant police officers, and [there was] a lack of evidence to prosecute [] Plaintiffs." *Id.* at ¶ 27.[3]

Perales' Account

Perales, the superintendent of Plaintiffs' building, testified that on June 9, 2012, Espinal was in the hallway crying and Perales asked her if she was okay. D.E. 67, Ex. D ("Perales Dep.") at 17:12-15. Later, Perales observed Rodriguez shove Espinal up the steps of the hallway. *Id.* at 17:21-25. Perales stated that he could hear screaming, throwing of objects, and slamming doors. *Id.* at 18:01-04. At this point, Perales called the police.

---

[3] Plaintiffs also attach a number of internal investigation reports related to Defendants Baird and Ungarian from 1999 to 2013. D.E. 71, Ex. 9. However, Plaintiffs no longer bring any claims against the City of Paterson based on a pattern, practice, or custom of constitutional violations.

4

When the police arrived, Perales told the police that Plaintiffs had been arguing for a while. *Id.* at 19:05-15. Perales remained in his apartment, but heard a commotion coming from Plaintiffs' apartment. *Id.* at 19:16-23. Perales then heard a police officer say "[h]e swung at me" and heard a loud bang. *Id.* at 19:24-20:03. At this point, Perales left his apartment and ran upstairs to Plaintiffs' apartment. *Id.* Perales observed one officer on top of Rodriguez, and then observed Espinal bite the officer on the arm. *Id.* at 20:08-14. Perales stated that Rodriguez was resisting the officer and "kept on trying to get away from him by moving side-to-side, and the officer was telling him he needs to calm down and to stop resisting." *Id.* at 20:20-23. After Espinal bit the officer, one of the officers attempted to hold her down. *Id.* at 21:05-10. According to Perales, the officer

> just took [Espinal] down, as I recall, just taking somebody to try to keep them calm so they could put the handcuffs on her. He didn't slam her. He didn't do nothing outrageous. He just took her down to a laying position, and as soon as he took her down, had her two hands in the back, put them in handcuffs and called for help at the same time.

*Id.* at 22:03-10. At the same time, Rodriguez "was still trying to fight the other officer to get up." *Id.* at 22:11-12. Additional officers then arrived, and Perales went back to his apartment. Perales later stated that both Plaintiffs were drunk at the time. *Id.* at 26:14-16.

## II. PROCEDURAL HISTORY

On May 30, 2014, Plaintiffs filed a Complaint against the City of Paterson, Ungarian, and Baird. D.E. 1. The Complaint has three counts, alleging various federal and New Jersey constitutional violations. All Defendants submitted Answers that included various crossclaims. D.E. 5, 6, 7. On February 25, 2016, the case was reassigned to this Court. D.E. 34. On July 17, 2017, the City of Paterson was dismissed with prejudice per the parties' stipulation. D.E. 65. The current motions followed.

5

### III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the

court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### IV. ANALYSIS

As an initial matter, the Court previously dismissed the City of Paterson per the parties' stipulation. D.E. 65. Accordingly, Plaintiffs' Count Two, which asserts municipal liability pursuant to 42 U.S.C. § 1983 against the City, is dismissed as moot.

Consequently, only Counts One and Three remain. Count One is brought pursuant to 42 U.S.C. §§ 1981 and 1983, alleging violations of the Fourth and Fourteenth Amendments. Compl. at ¶¶ 18-24. Specifically, Count One alleges that Plaintiffs were "deprived of their right to equal protection when they were selectively targeted by [] Officer Ungarian . . . because of the race and ethnicity," "were deprived of their right to be free from excessive use of force," and "denied the same privileges and immunities guaranteed [] under the law based on their national origin and ethnicity." *Id.* at ¶ 20-22. Count Three brings an action pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-2, alleging similar constitutional violations, including violations of equal protection, the right to be free of unreasonable searches and seizures, the right to be free from excessive force, and being "denied the same privileges, immunities and rights as white persons." *Id.* at ¶¶ 33-36.

Plaintiffs indicate that they do not wish to proceed with any federal or state equal protection claims against Baird. Opp. Br. at 18. Accordingly, Plaintiffs' claims against Baird based on violations of equal protection are dismissed with prejudice.

### A. Count One

As noted, Count One brings three claims: equal protection, excessive force, and deprivation of privileges and immunities. The Court examines each in turn.

#### i. Section 1983 Equal Protection Claim

42 U.S.C. § 1983 ("Section 1983") provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to state a claim under Section 1983, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. To establish an equal protection claim, plaintiff must show that the defendants' actions: "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002). "To prove discriminatory effect, plaintiff[s] must

show that [they are] a member of a protected class and that [they were] treated differently from similarly situated individuals in an unprotected class." *Id.* To prove discriminatory purpose . . . plaintiff[s] must show that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Laguda v. City of Rahway*, 2016 WL 1029789 at *8-9 (D. N.J. 2016) (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).

Plaintiffs are proceeding with their equal protection claims against Ungarian. As discussed in note 1, *supra*, Ungarian failed to submit his own brief in support of his motion for summary judgment. Instead, Ungarian submitted a notice of motion that indicated that he would rely on Baird's submissions. D.E. 68. Defendant Baird argues that Plaintiffs "have failed to provide a scintilla of evidence of purposeful discrimination, or any examples of similarly situated individuals in an unprotected class – or any similarly situated individuals, for that matter – who received different treatment than they did." Baird Br. at 12. Baird continues that "plaintiffs have made no showing that the officers would have acted any differently with other similarly situated individuals." *Id.*

Plaintiffs do not submit any argument or analysis related to their equal protection claims. Instead, Plaintiffs respond that they do "not intend to proceed with his federal and state equal protection claims against Officer Baird, *but only as to Officer Ungarian, who has not submitted any motion for summary judgment*." Opp. Br. at 18 (emphasis added). In fact, Ungarian has filed such motion, albeit by joining Baird's motion. *See* D.E. 68.

The Court finds that Plaintiffs point to no evidence creating a genuine issue of material fact to support their equal protection claim. Plaintiffs do not identify any evidence that they were members of a protected class, that Defendants were motivated by a discriminatory purpose, or that

9

Plaintiffs were treated differently from other similarly situated individuals in an unprotected class. Accordingly, Defendant Ungarian is granted summary judgment on Plaintiffs' equal protection claims.

### ii. Section 1983 Excessive Force Claim

Plaintiffs allege the Defendants engaged in excessive force in violation of the Fourth Amendment, as applied to Defendants by way of the Fourteenth Amendment. "The Fourth Amendment, which protects persons from 'unreasonable searches and seizures' prohibits false arrest, false imprisonment, illegal search and seizure, and the use of excessive force.'" *Roman v. City of Newark*, No. 16-1110, 2017 WL 436251, at *3 (D.N.J. Jan. 31, 2017) (quoting U.S. Const. amend. IV). Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 618 (1988) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 619 (quotation marks and citation omitted).

"The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *Couden v. Duffy*, 446 F. 3d 483, 496 (3d Cir. 2006). In assessing the validity of an excessive force claim, a court must determine the objective reasonableness of the alleged conduct. *Id.* A court should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Groman,* 47 F.3d at 634 (quoting *Graham*, 490 U.S. at 396). Courts may also consider the following:

> [T]he possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). When more than one officer is sued on a Fourth Amendment excessive force claim, the district court must evaluate each officer's liability separately. *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, n.7 (3d Cir. 2006) ("In order to prevail on a [Section] 1983 claim against multiple defendants, a plaintiff must show that *each* individual defendant violated his constitutional rights." (emphasis added) (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005))).

Defendants argue that they are entitled to qualified immunity. In Section 1983 suits, "[q]ualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014) (emphasis added). A court must engage in a two-part inquiry to determine whether qualified immunity applies: (1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that defendant's conduct violated a constitutional right and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts have the discretion to consider either prong of the two-part analysis first. *Id.* at 236. The Supreme Court has ruled that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "To make that determination, [a court should] engage in another reasonableness inquiry: 'whether it would be clear to a reasonable officer that his conduct was unlawful in the

11

situation he confronted.'" *Santini v. Fuentes*, 795 F.3d 410, 417–18 (3d Cir. 2015) (quoting *Saucier*, 533 U.S. at 202. This analysis is "undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Generally, a court must view the facts in the light most favorable to the non-moving party. *Id.* at 326; *see Scott v. Harris*, 550 U.S. 372, 378 (2007) (finding that when the parties' versions of the facts differ substantially at summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," and therefore, in "qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." (internal quotations, citations, and brackets omitted)). Qualified immunity is "an immunity from suit rather than a mere defense to liability" so it is "effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, qualified immunity "is considered at the earliest possible stage of proceedings, apart from the analysis of the underlying claim itself." *Giles*, 571 F.3d at 325–26.

Regarding Plaintiffs' excessive force claims, the parties provide fundamentally incompatible and contradictory accounts of what happened on June 9, 2012. These differing accounts preclude the Court from finding that Defendants are entitled to qualified immunity. According to Plaintiffs' testimony, there was no physical altercation between Plaintiffs before the officers arrived. D.E. 71, Ex. 2 ("Espinal Dep.") at 102:14-21. Once the officers arrived, Rodriguez claims that the "big, stocky" officer punched Rodriguez in the face without any provocation. D.E. 71, Ex. 1 ("Rodriguez Dep.") at 59:6-8; 61:17-23. At one point in her deposition

12

Espinal stated that she "believe[d this officer] was Ungarian, the bigger one." Espinal Dep. at 29:11. Espinal later clarified that the shorter, "more muscular [officer], not the taller [officer]" was the officer that struck Rodriguez. *Id.* at 38:25-39:07; 42:02-10. Ungarian indicated in his use of force report that he used "[h]ands and/or fists" and "[k]icks and/or feet" in his interaction with Rodriguez. D.E. 71, Ex. 5 ("Ungarian Force Report"). Rodriguez recalls that he was unconscious, and that when he woke up, one of the officers kicked him in the eye. Rodriguez Dep. at 62:11-63:14. Rodriguez did not know which officer kicked him. *Id.* at 63:07-09. An officer then broke a chair over Rodriguez's back. *Id.* at 63:16-23. Espinal testified that after the shorter officer hit Rodriguez, he then hit her. Espinal Dep. at 42:04-10. Espinal recalled that she fell to the floor and started screaming and yelling, while the taller officer began to kick her in the back and head while Espinal was facedown on the ground. *Id.*

On the other hand, Baird states that Rodriguez pulled Espinal by her neck and that when Ungarian attempted to place Rodriguez under arrest, "[t]he suspect struck officer Ungarian about the body and shoulder area with closed fists" and later in the side of the face with a closed fist. D.E. 67, Ex. F ("Baird Report"). Baird continues that while Ungarian attempted to secure Rodriguez, Espinal jumped on Ungarian and scraped his neck. *Id.* Baird notes that when he tried to arrest Espinal, Espinal bit his left arm. *Id.* Baird's narrative report recounts the incident in a similar manner. D.E. 67, Ex. G ("Baird Narrative").[4]

The superintendent of the building, Moises Perales, appears to support the officers' recollection as to the events Perales witnessed. Perales indicates that Rodriguez was resisting

---

[4] Defendants state that "both plaintiffs were granted admission in that pretrial intervention [program] as a result of the charges" and that "[i]nherent in the PTI plea is the acknowledgement that defendants did not use unlawful force during the actual arrest." Def. Br. at 7. However, Defendant provides no support for this statement and does not attach any documents related to any charges or plea.

arrest and that Espinal bit one of the officers. D.E. 67, Ex. D ("Perales Dep.") at 20:04-21:19. Perales also states that the officer who was arresting Espinal "didn't slam her" and "didn't do nothing outrageous." *Id*. at 22:03-10. Perales adds that both Rodriguez and Espinal were drunk. *Id*. at 26:12-16.

In sum, Plaintiffs and Defendants offer vastly differing accounts of what happened on June 9, 2012. According to Plaintiffs, the Defendants engaged in excessive force without provocation. According to Defendants, Plaintiffs resisted arrest and physically assaulted Defendants, requiring the officers to use necessary and proportionate force. These factual disputes preclude summary judgment on Plaintiffs' excessive force claims. If Plaintiffs' version of events is to be believed, Ungarian struck both Rodriguez and Espinal without any provocation, and Baird subsequently struck and kicked both Plaintiffs without justification. There are genuine issues of material fact that preclude judgment for Defendants as to the excessive force claim. Thus, the Court denies Defendants' summary judgment on qualified immunity grounds. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (holding that "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue").

Accordingly, the Court denies Defendants' motions for summary judgment on Count One's excessive force claims.

### iii. Section 1981 Claim

Count One lastly alleges that "Plaintiffs were further deprived of their constitutional rights as protected under 42 U.S.C. § 1981 in that they were denied the same privileges and immunities guaranteed by under [sic] the law based on their national origin and ethnicity." Compl. at ¶ 22. Section 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce

>contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.
>
>(b) 'Make and enforce contracts' defined. For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
>(c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Section 1981 is generally understood to "prohibit[] racial discrimination in the making and enforcement of contracts and property transactions." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001). A Section 1981 plaintiff must prove the following elements: "(1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts." *Id.* at 797 (internal quotations and brackets omitted). Even if Plaintiffs could bring a claim pursuant to Section 1981 based on excessive force,[5]

---

[5] The parties disagree as to the scope of Section 1981. The United States Supreme Court has suggested, as recently as 2006, that "§ 1981, originally § 1 of the Civil Rights Act of 1866 . . . has a specific function: It protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (citation omitted); *accord Adams v. Officer Eric Selhorst*, 449 F. App'x 198, 204 n.4 (3d Cir. 2011) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 796 (3d Cir. 2001) for the proposition that "§ 1981 prohibits race discrimination in making and enforcing contracts"). There is clearly no contract between Plaintiffs and Defendants here.

However, the Third Circuit and some courts in this District have suggested that the scope of Section 1981 may extend beyond contract-related discrimination. *See, e.g., Mahone v. Waddle*, 564 F.2d 1018, 1028 (3d Cir. 1977) (holding that Section 1981, fourteen years before the addition of subsections (b) and (c), encompassed claims for false arrest and false

15

as described above, Plaintiffs fail to raise any genuine issues of material fact that they were treated differently based on their national origins, ethnicities, or races. Such discrimination is required in claims brought pursuant to Section 1981. *See Brown*, 250 F.3d at 797. In fact, Plaintiffs fail to substantively address this issue at all. *See* Opp. Br. at 18. Accordingly, Defendants are granted summary judgment on Count One's Section 1981 claims.

### B. Count Three

Count Three[6] makes similar allegations as in Count One, but is brought pursuant to the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-2. The NJCRA provides a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights,

---

imprisonment); *Brittingham v. Fiore*, No. 18-3453, 2018 WL 1919833, at *2 (D.N.J. Apr. 23, 2018) (citing *Mahone* for the proposition that "[t]he Court of Appeals for the Third Circuit has found that a plaintiff may bring a claim pursuant to § 1981 for improperly race-motivated law enforcement by a state government official"); *Estate of Oliva v. New Jersey*, 579 F. Supp. 2d 643, 666 (D.N.J. 2008) (finding that, based on *Mahone*, "a reasonable factfinder could conclude that motorists were stopped without probable cause because of their race, searched, and in some cases, arrested . . . [and therefore] the motorists would have a valid claim under § 1981 and *Mahone*") aff'd sub nom. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788 (3d Cir. 2010); *Tucker v. New York Police Dep't*, No. 08-2156, 2008 WL 4935883, at *7 (D.N.J. Nov. 18, 2008) ("An allegation that one has been subjected to false arrest and imprisonment on the basis of race states a claim under § 1981."); *Ramsey v. Dintino*, No. 05-5492, 2007 WL 979845, at *7 (D.N.J. Mar. 30, 2007) (holding that, pursuant to *Mahone*, "Third Circuit precedent permits plaintiffs to file suit under subsection (a) against police officers for violation of their constitutional rights").

Nevertheless, even if Section 1981 provides a vehicle for claims based on any of the conduct alleged in this case, Plaintiffs fail to raise any genuine issues of material fact regarding differential treatment based on Plaintiffs' national origins, ethnicities, or races. Accordingly, the Court declines to address the scope of Section 1981.

[6] Count Three refers to a "Plaintiff" in the singular rather than "Plaintiffs" in the plural. Compl. at ¶¶ 33-35. No party addresses this issue in their briefing, and all parties appear to assume that Count 3 is meant to apply to both Rodriguez and Espinal.

16

> privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2. The "NJCRA was modeled after § 1983, [and so] 'courts in New Jersey have consistently looked at claims under the NJCRA through the lens of § 1983' and 'have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart.'" *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (quoting *Samoles v. Lacey Twp.*, No. 12–3066, 2014 WL 2602251, at *15 (D.N.J. June 11, 2014) (internal quotation marks omitted)).

Given that Plaintiffs have shown genuine issues of material fact as to their Section 1983 excessive force claims, Count Three's state law NJCRA claims based on excessive force remain. However, as described above, Plaintiffs fail to show any genuine issues of material fact regarding their claims based on equal protection or Section 1981. Therefore, Defendants are granted summary judgment on Count Three's state law NJCRA claims based on equal protection and New Jersey's Section 1981 analog.

Remaining is Count Three's allegation that "Plaintiff was deprived of his right to be free of unreasonable search and seizure," pursuant to the NJCRA. Compl. at ¶ 34. Plaintiffs later state that "these rights are secured under the Fourth and Fourteenth Amendments to the United States Constitution." *Id*. at ¶ 36. Defendants fail to address this claim in their motions for summary judgment, and accordingly, Count Three's NJCRA claim based on unreasonable search and seizure remains.

In sum, Defendants are granted summary judgment on Count Three's NJCRA claims except for claims based on excessive force and unreasonable search and seizure.

## V. CONCLUSION

For the reasons set forth above, the motions for summary judgment made by Defendants Baird (D.E. 67) and Ungarian (D.E. 68) are **GRANTED** in part and **DENIED** in part. Defendants' motions are **GRANTED** as to Plaintiffs' federal and state law claims based on equal protection and Section 1981. Defendants' motions are **DENIED** as to Plaintiffs' federal and state law claims based on excessive force and illegal search and seizure pursuant to Section 1983 and the NJCRA. Count Two is dismissed as moot. Remaining are Count One's excessive force claims brought pursuant to Section 1983 and Count Three's excessive force and illegal search and seizure claims brought pursuant to the NJCRA. An appropriate Order accompanies this Opinion.

Date: June 25, 2018

_____
John Michael Vazquez, U.S.D.J.
